THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In re:

CHESAPEAKE HARDWOOD PRODUCTS, INC.,

      Debtor in Possession.

Case No. 10-70248-FJS
Chapter 11

## MOTION FOR AUTHORITY TO USE CASH COLLATERAL

COMES NOW Chesapeake Hardwood Products, Inc. (the "Debtor" or "CHP"), by counsel, and moves the Court for entry of an order authorizing the Debtor to use cash collateral, upon the terms outlined in this Motion, which cash collateral secures obligations to a secured creditor. In support thereof, the Debtor states as follows:

### Statement of Jurisdiction

1. On January 20, 2010 (the "Petition Date"), CHP filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code.

2. CHP continues to operate its business as a Debtor in Possession pursuant to 11 U.S.C. §§ 1101(1), 1107 and 1108.

3. As of the date of the filing of the instant Motion, the United States Trustee has not appointed a creditors' committee.

4. Jurisdiction to consider this matter is invested in this Court pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Karen M. Crowley, Esq., VSB #35881
John M. Ryan, Jr., Esq., VSB #37796
Nicole Rosenblum, VSB #42780
Crowley, Liberatore & Ryan, P.C.
1435 Crossways Boulevard, Suite 300
Chesapeake, VA 23320
(757) 333-4500
Counsel for the Debtor

## Background

5.  CHP was formed in 1989 to acquire the assets of the Paneling Division of Weyerhaeuser Company. CHP's primary business was the manufacture, processing and distribution of wood products such as paneling and plywood to and for retailers throughout the United States.

6.  Part of the assets it acquired from Weyerhauser was the real property on which it operated its manufacturing facility at 201 W Dexter Street in Chesapeake, Virginia (the "Facility"). The Facility was constructed in 1966 by Evans Products and operated by Evans Products until 1975, when it was purchased by Weyerhaeuser.

7.  Due largely to the housing downturn, CHP was been unable to operate its business profitably. After extensive efforts to sell the business as a going concern, CHP stopped operating its business in or around August of 2008. It turned to the process of liquidating its assets for the benefit of its creditors. The liquidation process was closely monitored by Wells Fargo Bank, N.A. ("WF"), CHP's secured lender.

5.  Since the cessation of operations, CHP has liquidated its accounts receivable, inventory, machinery and equipment and used the proceeds to primarily pay down the secured obligations to WF.

6.  Although nominal assets exist that could be subject to liquidation, the only meaningful source of recovery for repayment to the creditors is the Facility.

7.  The Facility is located on 20.98 acres in Chesapeake, Virginia and consists of a 445,000 square foot industrial building built in 1967/1968 with successive additions between 1971 and 1972. The Facility includes a 30,000 square foot shipping enclosure and 13,804 square feet of office finish.

## Current Status of CHP

8.  CHP has been actively marketing the lease and sale of the Facility. CHP has utilized the services of GVA Advantis and then Thalhimer to market the lease and sale of the Facility.

9.  CHP has a lease agreement with Pearl Avenue USA, Ltd. ("Pearl USA") at a rate of $2.00 per square foot for manufacturing space (estimated 95,000 square feet) and $3.50 per

2

square foot for office space (estimated 5,000 square feet) (the "Pearl Lease"), on a triple-net basis.

    a. Pearl USA is affiliated with CHP through common management.

    b. Pearl USA manufactures and distributes wood products from the Facility area it leases. CHP sold certain of its equipment and machinery to Stanpark BVI Ltd. in August 2008 for $800,000. These sales proceeds were remitted to WF to pay down the WF Obligations. Stanpark leases this equipment and machinery to Pearl USA.

    c. When the Debtor was unable to continue operating as a going concern, Pearl USA established relationships with certain of the Debtor's customers and now operates part of the business formerly operated by CHP.

10. In December of 2009, CHP leased an additional 60,000 square feet of the manufacturing and distribution Facility to Eden Fuels, LLC ("Eden Fuels"), an entity unrelated to the Debtor, for the manufacturing or wood fuel pellets and related uses (the "Eden Fuels Lease"). The Eden Fuels Lease obligates Eden Fuels to pay $10,000 per month as base rent, plus $3,500 per month additional rent, to the Debtor. The Eden Fuels Lease payments do not commence until March 2010.

11. The Pearl Lease and the Eden Fuels Lease are referred to hereinafter as the "Leases".

12. The Debtor has continued to market the Facility for lease or for sale. To date, no potential purchaser has offered to pay a meaningful price for the Facility. The Debtor has refocused its efforts to leasing the Facility and has made significant progress in that regard.

13. CHP believes that, through the Chapter 11 process, it will be able to maximize the value of the Facility and provide for the payment of the amount justly due and owing to its creditors in an orderly fashion, while adequately providing for and protecting its secured creditor, for the benefit of all of its creditors.

## Debt Structure of CHP

14. The books and records of CHP reflect, in approximate amounts, $2.37 million of secured debt to WF, $500,000 in secured fees to WF, $1.0 million of employee severance claims, $405,000 of estimated unfunded pension plan liability, $2.2 million of unaffiliated trade debt and $6.5 million of debt to entities or persons currently or formerly affiliated with CHP.

15. CHP owes monies to WF pursuant to credit advanced by WF pursuant to a Revolving Note in the original principal amount of $12,500,000.00 dated July 31, 2007, by which WF provided a revolving line of credit to the Debtor (The "Revolving Credit Line").  WF also advanced credit to the Debtor pursuant to a Term Note in the original Principal Amount of $ 5,000,000.00 dated July 31, 2007 (the "Term Note") (The Revolving Credit Line and the Term Note are referred to collectively hereinafter as the "WF Obligations").  The WF Obligations are secured by a deed of trust against the Facility, an assignment of rents, as well as a blanket lien against all of the Debtor's personal property (the "Collateral")

16. Through the liquidation of its assets, CHP has been able to reduce the principal obligation to WF to approximately $2.371 million.  When combined with unfunded forbearance fees of $150,000 and a pre-payment premium of $341,000, the total secured debt to WF is approximately $3.0 million.

17. WF declared CHP in default under the loan documents in November of 2007. Beginning in November 21, 2007 and numerous times thereafter, CHP and WF entered into forbearance agreements that, among other things, provided time for CHP to refinance its obligations or to liquidate its property in order to fully satisfy the obligation of CHP to WF.

18. Until November of 2009, CHP remained current on its interest payments to WF through the lease payments it received from Pearl USA.  No interest payments have been paid to WF beginning in the month of November 2009.

19. Within the past several weeks, CHP received notice that WF sold the Term Note and loan documents associated with the WF Obligations to a Virginia entity named PC Group, LC.

CHP has no information as to the persons associated with PC Group, LC but can represent that no current insider, officer or director of CHP is affiliated with PC Group, LC.

## Use of Cash Collateral

20. The proposed use of cash collateral preserves the opportunity to examine the extent, validity and priority of the liens against the Collateral, and to maintain the value of the Facility while a Plan of Reorganization is developed and shepherded through the confirmation process. The factual allegations in the Motion are made without prejudice to any right to contest the secured claims or the collateral position of the holder of the WF Obligations.

21. The proceeds, products, rents and profits of the Collateral, including the rents flowing from the Leases, constitute cash collateral of WF in accordance with 11 U.S.C. § 363(a) (the "Cash Collateral").

22. In order to remain in possession of its property, determine the extent, validity and priority of any liens, and achieve a successful reorganization, the Debtor must use Cash Collateral to insure and pay limited costs related to the Facility.

23. In accordance with 11 U.S.C. § 363(c)(2)(B), the Debtor requests that this Court authorize and approve its use of Cash Collateral for the payment of its limited operating expenses as set forth in the budget attached hereto as Exhibit A (the "Budget"), which reflects projected monthly income and expenses through the end of July 2010.

24. The Debtor anticipates that any proposed order would provide, among other things, for the following adequate protection to WF:

    a. The Debtor will place any and all cash, checks or monies it collects, receives or derives from the operation of its business or the use of the Collateral (whether pre- or post-petition) into the Debtor's Debtor-in-Possession bank account (the "Account"). Without further authorization from this Court, the Debtor will pay from the Account only reasonable and necessary operating expenses incurred in the ordinary course of the Debtor's business, as set forth on the Budget.

b. The Debtor will provide the holder of the WF Obligations with replacement liens pursuant to and in accordance with 11 U.S.C. § 361(2), in and to all property of the estate of the kind presently securing repayment of the Secured Debt ("Post-Petition Collateral"), such liens to attach to the Post-Petition Collateral to the same extent, validity and priority as such liens exist on the Collateral.

c. The Debtor maintains all rights to contest the amount, extent, validity and priority of liens and its secured debts.

25. The proposed use of cash collateral will provide that the Debtor and any committee of unsecured creditors formed in this case will be given a period of time to evaluate the extent, validity and priority of the liens of WF against the Collateral.

26. Without the use of Cash Collateral, the Facility and the reorganization efforts of the Debtor could be seriously and irreparably harmed, resulting in significant losses to the Debtor's estate and its creditors.

WHEREFORE, Chesapeake Hardwood Products, Inc. respectfully requests entry of a final order authorizing the Debtor to use the Cash Collateral to pay the necessary expenses of maintaining the Facility, including the insurance, taxes, fire suppression and the other expenses detailed on Exhibit A, as supplemented at the time of the final hearing, and granting the Debtor such other and further relief as may be proper and just.

CHESAPEAKE HARDWOOD PRODUCTS, INC.

By: /s/ Karen M. Crowley
    Counsel for the Debtor

Karen M. Crowley, Esq., VSB #35881
John M. Ryan, Jr., Esq., VSB #37796
Nicole Rosenblum, Esq. VSB #42780
Crowley, Liberatore & Ryan, P.C.
1435 Crossways Boulevard, Suite 300
Chesapeake, VA 23320
(757) 333-4500
Counsel for the Debtor

## CERTIFICATE OF SERVICE

I certify that on the 21st day of January, 2010, a true copy of the foregoing Motion was sent by first class, postage paid mail to the parties on the attached service list.

/s/ Karen M. Crowley